HAWKINS, Justice,
for the Court:
Appellee Larry Ray (herein Ray) secured a jury verdict and judgment for $40,000 in the Circuit Court of Coahoma County against appellants Jerry Bratschi and his employer South Central Bell Telephone Company (herein Bratschi and Bell) for personal injuries received as a result of the alleged negligence of Bratschi. From this judgment appellants have appealed with several assignments of error.
Addressing the first and most serious issue, the sufficiency of the evidence to make this a jury case, or to justify a jury verdict, our appellate authority requires us to view the evidence in the light most favorable to appellee. Within these confines we relate the pertinent portions of the record.
On April 23, 1979, between 2:30 and 3:00 o’clock on a wet, rainy afternoon, and while an employee of the Crossroads Service Station in Clarksdale, Ray received a service call to attend to a flat tire on a three quarter ton pickup equipment truck belonging to Bell and being operated by Bratschi. The pickup was parked on the right shoulder of the highway, the left rear tire flat. The ground was muddy; Bratschi had on a rainsuit. As an accommodation to the employee of Crossroads, Bratschi had already removed the spare tire from the truck and either loosened or removed the lug nuts on the wheel with the flat prior to Ray arriving on the scene.
When Ray first arrived he removed a roller jack from the wrecker and attempted without success to lift the wheel by jacking up the left side of the truck in front of the wheel. At its maximum height, the jack still did not lift the wheel off the ground. Ray then removed the jack, took it to the rear of the truck and placed it under the center of the rear axle, or differential. At the request of Bratschi, Ray refrained from placing the jack under a rear bumper, Bratschi telling him the bumper was only spot welded. He got a good fit under the differential and jacked up the rear of the pickup, but because the ground was muddy the jack sank into the ground somewhat, and even after reaching its maximum height the left wheel still was not off the ground.
Ray then secured from the wrecker a piston jack and a four inch square board to use in lifting the wheel. Upon returning to the rear of the pickup Ray observed Brats-chi pumping the handle of the roller jack attempting to further lift the pickup. The jack was making an “oinking” sound indicating it had reached its maximum height and that further pumping of the handle was useless. According to Ray, he told Bratschi the roller jack was not going to lift any higher, there was no need pumping it, and he was going to have to get under the truck with the board and piston jack and try to the jack the truck up further so the wheel could be removed.
Ray than got down and pushed the board and piston jack up under the left rear of the truck and followed in behind, all while Bratschi was standing at the jack handle of the roller jack not over 2 or 3 feet from where Ray was going under the truck. When he got under the truck, Ray noticed the roller jack was holding the truck at the same height and in the same place.
Ray intended to put the piston jack on the board under the left part of the rear axle and then jack the wheel up further. He placed the jack in one place first, and *1358 thinking it was not stable in that position moved it. He was lying on his stomach. Ray then positioned the board and jack in another place. His left hand was on the board and the base of the jack, and the right hand was at the top of the telescopic part of the piston jack, with his right forefinger on the top and just beneath the axle, in his endeavor to secure a good fit of the top of the jack with the bottom of the axle. In Ray’s estimation he had then been under the truck for approximately five to ten minutes.
At this moment when he was thus positioned, Ray heard a hissing sound as the roller jack fell down quickly, and the axle smashed his right forefinger, and causing the distal tip, the joint space and top of the next bone to have to be surgically amputated.
The instrument which brought about ap-pellee’s injury was a common hydraulic jack on rollers, with a removable pipe handle approximately four feet in length. To fully understand our rationale in this case it is first necessary to describe this particular jack.
It had a capacity to lift 3,000 pounds. The handle to the jack fulfilled the following functions: after placing it into position into the jack and turning the handle clockwise — to the right — the valves were positioned so that by pumping the handle vertically the fluid in the jack would exert sufficient pressure to raise the jack and thereby lift a vehicle. To release the pressure, the handle was turned counter-clockwise — to the left. On this particular jack the slightest manual movement, a minimum force counter-clockwise, would operate to release the pressure and cause the jack to lower. Insofar as lowering a vehicle by turning the handle counter-clockwise, this particular jack might be roughly described as having a “hair trigger”. There was one additional method of releasing the fluid pressure in the jack, and that was by turning a screw on the jack itself. In order to turn the screw, it was necessary to use a screw driver. In the absence of turning the handle counter-clockwise, or the screw in the jack itself, the jack was stable, and would retain a lifted weight up to 3,000 pounds indefinitely.
Two more features of this jack are significant. When the jack had been raised its maximum height, continued pumping of the handle caused the jack to emit an “oinking” sound discernible to the ear. When the jack was supporting a lifted vehicle, and the pressure released to lower the jack, it emitted an entirely different sound, a hissing sound, also discernible to the ear. It was the former sound Ray heard as he observed Bratschi pumping the handle in an attempt to further raise the jack, and the latter when the axle descended on his forefinger.
To ascertain what transpired outside the truck in the precipitation of this accident, we must turn to the testimony of Bratschi. All Ray knew was that Bratschi was standing there next to the handle as he went under the truck. After getting beneath the truck, he did not observe Bratschi make any movement prior to the jack descending.
The Court must commend both Ray and Bratschi as estimable, trustworthy witnesses; neither attempted to embellish their versions or color their testimony. Each gave testimony “to his own hurt.”
Reading the testimony of Bratschi in one light, Bratschi only had his hand on the handle of the jack when it suddenly lowered. In another light, he was perhaps demonstrating how he was pumping the handle when it suddenly lowered. By either view, Bratschi had manual contact with the only thing about the jack which could have caused it to lower at the time it did, absent some malfunction. While he did not believe he turned the handle counterclockwise he acknowledged it was possible, he was wet, the jack was wet, and “everything like that.” Bratschi is left handed.
Incredibly, Bratschi testified he was unaware Ray went under the truck, despite the fact he was standing at the rear of the pickup during this entire period. He testified he would never have pumped the handle had he known Ray was under the truck. This was an acknowledgment by him that had he known Ray was under the truck, he *1359 would have certainly known better than to tamper with a jack supporting the truck. Although Bratschi had no familiarity with the operation of this jack, presumably he was familiar with machinery, being a maintenance man with Bell.
We are not faced with the question of whether or not it amounted to negligence to tamper in any way with a jack handle to a jack supporting a vehicle with a person underneath the truck. It did, and Bratschi so acknowledged.
The question is whether Bratschi did anything to cause the jack to suddenly lower. Or, put another way, was a jury issue made on whether or not the sudden release of the pressure holding the jack up was a result of some act on the part of Bratschi.
Considering the nature of the jack, together with the undisputed evidence that Bratschi in this instance was the only person who could have caused the jack to suddenly lower as it did, and that he did have his hand on the very apparatus that would lower the jack, that it did suddenly, lower, we think it a fair inference for the jury to decide from the circumstances as to whether Bratschi did something to cause the jack to suddenly lower to appellee’s injury.
This case is analogous to Davis v. Flippen, 260 So.2d 847 (Miss.1972), a case before this Court involving some telephone repairmen. The defendants were pulling some wires from a conduit attached to the ceiling of a factory, when the conduit fell injuring the plaintiff. The trial court peremptorily instructed the jury to find for the defendants, and upon appeal, in reversing and remanding the case our Court held:
It is also well settled that negligence may be proven by circumstantial evidence and when the case turns on circumstantial evidence it should rarely be taken from the jury. Cameron v. Hootsell, 229 Miss. 80, 90 So.2d 195 (1956).
.... We think that the evidence and the reasonable inferences that could be drawn therefrom were sufficient to make an issue for the jury to determine whether appellees were guilty of any negligence that caused or contributed to appellant’s injury.
(260 So.2d at 848).
The jury also had before it in this case that as Ray was raising the jack under the differential the handle came out once according to him, and twice, according to Bratschi. When this occurred, it was necessary, in order for Ray to get the handle back into the jack to crawl under the truck and release the pressure by the screw, which he did, and then re-inserted the handle and pumped the jack back up. The jack had been holding the vehicle up for some period with no malfunction whatever, however, when, unfortunately, with Ray under the truck and Bratschi with his hand on the handle, it fell.
On the issue of liability in this case, the verdict of the jury was not based upon pure speculation, which this Court could not sanction, but a legitimate inference from the facts, which we have no authority to disturb. See Matthews v. Carpenter, 231 Miss. 677, 97 So.2d 522 (1957).
Appellants earnestly seek the invocation of our rulings in Callender v. Cockrell, 217 So.2d 643 (Miss.1969); Taylor v. Williams, 190 So.2d 872 (Miss.1966); and Bradshaw v. Stieffel, 230 Miss. 361, 92 So.2d 565 (1967). They claim.the testimony of Ray, who was on his stomach under the truck in an effort to place the second jack, that he did not believe Bratschi was pumping the jack, that he would have sensed such pumping up and down, coupled with the further alleged positive assertion by Bratschi that he was pumping the handle when the jack fell, precludes Ray from making any claim that Bratschi did anything to contribute to this unfortunate accident. It would be rather strained for us to go so far as to hold Bradshaw, Taylor and Callender apply in this case to the extent of barring recovery. These cases preclude a party from testifying to certain facts directly within his knowledge, and then offering testimony to contradict his own statements of facts.
To apply the rule the following pre-requi-sites must appear in the record:
*1360 (1) The party must be in a position to testify positively to the facts so testified; i. e., what he testifies to must be in his own plain view, or he be otherwise situated so that there can be no mistake in his observation.
(2) He must testify to facts which if true would defeat recovery.
Here, Ray was under the truck, very much occupied with a rather serious business, with the rain coming down, the road muddy, and to attempt to hold him to strict account as to whether Bratschi, standing outside and behind the truck, pumped the handle up and down or not, is stretching the cited rule beyond its reason for existence.
Appellants complain the $40,000 verdict evinced bias and prejudice requiring reversal or remittitur. The accident smashed the right forefinger of Ray, who is right-handed, and a mechanic and manual worker. He sustained $1,785.22 in medical expenses, and $4,802.40 loss of wages. He was off work 23 weeks. The injury was severely painful, and after surgically amputating a portion of the finger, a second surgical amputation was required through the first joint. The testimony showed Ray could be expected to suffer pain for an indefinite period into the future, that he had suffered embarrassment, and for approximately 300 days he had been unable to do the normal, simple tasks such as picking up a cup, or change. He had a life expectancy of 47 years. We cannot say the verdict in this case was so excessive as to evince bias or prejudice.
We do not consider any other assignment of error merits discussion.
For the reasons stated, the judgment is affirmed.
AFFIRMED.
PATTERSON, C. J., SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE and BOWLING, JJ., concur.